Stefan Savic
**SHIPKEVICH PLLC**
165 Broadway, Suite 2300
New York, New York 10006
Telephone:     (212) 252-3003
Facsimile:     (888) 568-5815
ssavic@shipkevich.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **YOLANDA WEALTHBERG,** | Index No.: |
| Plaintiff, | **COMPLAINT** |
| - against – | **PLAINTIFF DEMANDS A TRIAL BY JURY** |
| **GE CREDIT UNION a/k/a GENERAL ELECTRIC EMPLOYEES FEDERAL CREDIT UNION and ELSIE VRABEL,** | |
| Defendants. | |

Plaintiff Yolanda Wealthberg ("Wealthberg" or "Plaintiff"), by and through her attorneys Shipkevich PLLC, hereby allege as follows:

## INTRODUCTION

1.  This case arises out of the egregious and unlawful conduct on behalf of Defendant GE Credit Union a/k/a General Electric Employees Federal Credit Union ("GE") and its Collections Manager Elsie Vrabel ("Vrabel" and together with GE "Defendants"). Contrary to GE's moto "Your money. Your dream. Our commitment.," Defendants turned Wealthberg's life into a nightmare through intentionally false credit reporting, unwarranted repossession of vehicles, baseless criminal prosecution, and harassing conduct directed to Wealthberg and her family.

1

2.  In order to get an upper hand in the dispute over a purported lien, Defendants employed illegal pressure tactics against Wealthberg and companies associated with her, claiming that she was late on or missing various payments that Defendants knew were always timely made. Defendants reported this false information to the credit reporting agencies in order to ruin Wealthberg's credit and, in turn, her businesses.

3.  Internal communications show that Defendants knew the information they were reporting to be incorrect, yet they did nothing to stop, let alone remedy, their conduct.

4.  Defendants knew that  their reporting and claims were false as reflected in, among other things, internal correspondence where GE's Vice President of Lending, indicated that "[Wealthberg] got the loan in June 2019 so she can't be delinquent in June of 2019 . . . ." Another internal email discussing Defendants' conduct shows concern "about the credit reporting issue and possible GE liability" adding that a "[r]esolution of all with releases (even if for less than full payment) would be a homerun."

5.  The nightmare did not end there. Vrabel,[1] who was the main aggressor on behalf of GE, would make threatening calls to Wealthberg and her daughter, calling Wealthberg "a piece of shit" and calling her "retarded" due to Wealthberg's medical condition following a brain injury.

6.  In order to get Wealthberg to release claims against GE, Vrabel made other comments like: "All American lawyers are idiots and they cannot help you. I am an attorney in South Africa and I have a degree in credit management. I will ruin your life."

---

[1] Wealthberg unfortunately appears not to be Vrabel's only victim, according to certain recent reviews where other customers of GE complained. For example, one customer complained that "[t]he worst credit union bank you can ever deal with ! [sic] They have the worst customer service I have ever dealt with ! [sic] Elsie vrabel [sic] was very rude !!! Closed my account two times in one day after a branch manager Talked [sic] to her boss & got it reinstated because there was no reason for her closing it & then she closed it again!" Another customer stated, "Don't use this credit union they are crooks and screwed my 81 yr [sic] old grandfather out of a lot of money and I will make it my priority to make sure this union has the lowest reviews that is [sic] has ever had [smiley face emoji] happy holidays Elsie I hope you loose [sic] your job I will make that my priority as well [winky face emoji]"

7.   Unfortunately, this was not an empty threat and Vrabel made sure to fulfill her promise.

8.   Defendants' misconduct, which involved daily threatening and harassing calls, caused significant harm to Wealthberg's health, income, and her businesses, including hospitalization and inability to receive certain assistance to which she was entitled and otherwise making it almost impossible for Wealthberg to manage her day-to-day personal and business affairs.

## PARTIES

9.   Plaintiff Yolanda Wealthberg is a natural person residing in Connecticut. Wealthberg is the sole member and founder of National Healthcare Worker's Association, LLC ("NHWA"), which trains, certifies, and provides credentials to and for various subsections of healthcare workers such as phlebotomists, medical assistants, patient care technicians, emergency room technicians, surgical technicians, dental assistants, residential healthcare technicians, and many other related disciplines.  NHCWA also maintains a registry of all individuals who hold certifications and credentials through NHCWA.

10.   Wealthberg is also the sole member and founder of Wealthberg Real Estate, LLC which is a real estate broker specializing in purchases and sales of residential and commercial properties in Fairfield and New Haven Counties and the founder of Woman Survival, Inc. ("Woman Survival"), which is a non-profit and licensed charity that provides temporary housing for abused, battered, and homeless women.  Wealthberg funds Woman Survival solely with her own after-tax income.

11. Defendant GE Credit Union a/k/a General Electric Employees Federal Credit Union is the 13th largest credit union in Connecticut, headquartered at 265 Sub Way, Milford, Connecticut 06461.

12. Defendant Elsie Vrabel is GE's Collections Manager.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over Wealthberg's claim for violations of the Fair Credit and Reporting Act pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction under 28 U.S.C. §1367(a) to hear and adjudicate state law claims as they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391 as Defendants reside in this District and the incident occurred in this district.

## STATEMENT OF FACTS

### *The Maserati Dispute*

15. Defendants' quest to ruin Wealthberg's life appears to mainly relate to a certain purchase of a 2018 Maserati Grand Turismo (the "Maserati"). On May 29, 2019, NHWA, a company that Wealthberg is the sole member of, purchased the Maserati, and, in her capacity as the principal of NHWA, Wealthberg obtained a loan from GE in the amount of $99,050.00.

16. Under the loan agreement, NHWA was to repay the loan over 72 months at the annual interest rate of 5.750%. NHWA was also to provide GE with the title of the Maserati, which would serve as collateral security for the loan.

17. Ultimately, claiming that NHWA never submitted the title to GE, GE instituted a lawsuit in Connecticut Superior Court on March 19, 2020, alleging breach of contract, misrepresentation, and conversion.

18. Months prior to GE's lawsuit, on October 30, 2019, as part Wealthberg's attempt to completely pay off the Maserati loan, Jamie Rivera, a Manager of Lending at GE ("Rivera") gave Wealthberg a payoff quote for the Maserati.

19. After receiving the payoff quote from Rivera, and as Wealthberg went to sell the Maserati, Wealthberg informed the dealership that there was a pending lien on the Maserati. The car dealer, however, was unable to locate any liens.

20. After the dealer was unable to locate the lien, Wealthberg called Rivera to inquire about the lien and Rivera explained that Rivera had forgotten to have the original dealer list the Maserati lien.

21. Because the lien was not listed and the amount owed on the Maserati was more than it was worth, Rivera told Wealthberg that she could sell the Maserati and to "hurry up" and gather the remaining funds owed to GE.

22. Rivera also told Wealthberg to hold on to the amount Wealthberg was paid for the Maserati until Wealthberg had the rest of the money for the payment.

23. On December 5, 2019, Rivera contacted Wealthberg via text message, acknowledging that Rivera was aware that the Maserati had been sold and asking on the status of the additional funds.

24. On December 19, 2020, Wealthberg became ill and someone else was taking care of her finances for a short period. During this period, the person handling the Maserati payment inadvertently sent the money to "GM Financial" instead of GE.

25. As soon as Wealthberg learned of this—which was after Wealthberg had recovered—she immediately went to GE and spoke to Rivera in person in the lobby of the building to explain what had happened and to let Rivera know that Wealthberg's attorney would remedy the inadvertent mistake.

26. Rivera again admitted that Rivera was aware of Wealthberg selling the Maserati. However, right after Wealthberg informed Rivera about the payment being sent to the wrong recipient,

Rivera began calling Wealthberg a "fraud" and inexplicably now claimed that the Maserati was sold without Rivera's knowledge or consent.

27. After Wealthberg's attorney contacted Rivera to request that Rivera cease accusing Wealthberg of fraud, Rivera sought intervention from Vrabel.

28. Shortly after that is when Vrabel's threats and harassment started, initially by Vrabel threatening Wealthberg with criminal and civil actions.

29. Wealthberg's attorney responded that a payment in full could still be easily made following the resolution of the issue with the funds having been sent to the wrong entity, GM Financial.

30. Vrabel rejected the offer of payment in full and instead stated that GE would sue for treble damages and would press criminal charges.

31. GE has never claimed any failure to make the regular payments on the loan.

*GE's Attempts to Obtain Full Release and Additional Payments*

32. On January 31, 2020, Vrabel and GE attempted to pursue criminal charges against Wealthberg with the Federal Bureau of Investigation ("FBI") and the Milford Police Department ("MPD") in an effort to unduly influence Wealthberg to settle the Maserati matter.

33. Defendants did so despite Wealthberg having already offered to pay off the Maserati in full.

34. But it was not the payment that Defendants were concerned about at this point; it was the release of claims for their illegal conduct.

35. This is why GE repeatedly rejected payment in full for the Maserati.

36. GE also recoded certain property located at 70 Fairview Avenue, West Haven, Connecticut as delinquent and 30 days past due for each month from May 2017 until March 2020. Defendants also coded this property as a charge off on a mortgage that was already fully paid off.

37. As with other accounts, this mortgage account was never delinquent.

38. Yet, Defendants did not care as they just wanted more ammunition to force Wealthberg into a settlement that would release GE for all of its violations.

39. Indeed, GE's counsel stated in an email concerning Wealthberg that due to the concern "about the credit reporting issue and possible GE liability [a] resolution of all with releases (even if for less than full payment) would be a homerun."

40. The criminal complaints were improper, unwarranted, and based on false allegations and, during the week of March 23, 2020, Vrabel agreed that she needed to withdraw the charges.

41. This was only after Wealthberg proved the charges to be frivolous and based on false information and evidence provided by Rivera.

42. After Vrabel agreed to withdraw the criminal complaints, Wealthberg followed up with Vrabel regarding the status of the withdrawal of the false credit reports, which Defendants also submitted as part of their harassment campaign.

43. But Vrabel decided that she could still use the false FBI and MPD reports to try to pressure Wealthberg into fully releasing GE from any claims.

44. On March 26, 2020, Defendants emailed Wealthberg the terms of what it would take to resolve the underlying Maserati matter.

45. In that email, Vrabel had agreed that she would withdraw the criminal charges against Wealthberg that Vrabel then already knew to be false in exchange for a settlement that would include payments for the Maserati and the Fairview property and a full release from any claims.

46. As Defendants were advised by their counsel, this would be a "homerun."

47. As evidenced by Vrabel's own prior email on March 23, 2020, and Wealthberg's response on March 25, 2020, no mutual release was initially discussed as Vrabel previously agreed to withdraw the false charges regardless of any settlement or release.

48. The filing and maintaining of false police and FBI reports was not the only way that Vrabel and GE attempted to coerce Wealthberg into signing a settlement agreement. GE and Vrabel also sent Wealthberg's non-Maserati related accounts—including accounts maintained by distinct companies—into collection in order to negatively impact Wealthberg's credit score and to keep Wealthberg from being able to complete routine personal and business activities like paying accounts that she was otherwise timely in paying and utilizing her line of credit.

49. When Vrabel finally realized that what she was doing was not only wrong, but illegal, she immediately backtracked and began trying to "repair" Wealthberg's credit by blaming the credit bureaus for the false reports that Vrabel had made and suddenly attempting to "help" the credit bureaus correct the false information.

50. In one email on May 16, 2020, from Vrabel to TransUnion, Vrabel states about Wealthberg that "[t]his member has always paid her loans on time and despite our response trying to rectify your database issues, you have not corrected the reporting."

*Wrongful Repossession of Another Vehicle*

51. As part of their pressure tactics, on or about March 15, 2020, Defendants also directed the repossession of a certain Nissan Rogue (the "Nissan") which belonged to Real Estate Network Center, a limited liability company affiliated with Wealthberg.

52. Both the company and the Nissan were and still are entirely unrelated to the Maserati dispute, security interest, or anything else having to do with GE's dispute with Wealthberg.

53. When the Nissan was repossessed, the tow truck driver refused to permit Wealthberg's employee, Connie White (also Wealthberg's mother)—who was driving the Nissan as the Nissan was registered under one of Wealthberg's businesses—to get her personal effects out of the vehicle, including Ms. White's purse, cell phone, and medication.

54. When the employee asked why she could not get her personal belongings, the tow truck driver told the employee that Wealthberg was three months behind on the payment *for the Nissan* and that she would have to call GE. That was, of course, incorrect.

55. Ms. White required the medication—which included thyroid medication, an asthma inhaler, and two additional medications due to recent surgeries—resulting in her needing to be seen by her doctors for failure to take her necessary medications. Ms. White did not get her medication back until the next day.

56. The Nissan was, unsurprisingly, repossessed at the direction of GE and Vrabel.

57. Yet again realizing their error, within only a few days of repossessing the Nissan, Defendants subsequently directed that the Nissan be returned to its owner and it was, in fact, returned several days after it was repossessed.

58. Bizarrely, GE is still attempting to charge Wealthberg the costs for the illegal repossession and is even trying to charge Wealthberg for additional insurance on the Nissan.

59. On June 12, 2020, GE called Geico—the insurer for the Nissan—and changed Wealthberg's email address on file and requested Wealthberg's billing history to confirm Wealthberg had insurance on the vehicle. Wealthberg never gave GE permission to do either of these things.

60. Geico confirmed to GE that Wealthberg had insurance on the Nissan.

61. Despite Geico confirming that Wealthberg had insurance, GE claimed to Wealthberg that her insurance had lapsed/cancelled and required her to pay $2,422.00 in additional insurance.

62. GE threatened to again repossess the Nissan if Wealthberg did not pay this additional insurance.

63. On July 13, 2020, GE again called Geico and Geico again informed GE that Wealthberg had insurance on the Nissan.

64. Despite this, on July 14, 2020, GE added the additional cost of the Nissan insurance to Wealthberg's required payments.

65. On July 16, 2020, Wealthberg emailed Defendants to again inform them, through supporting documentation from Geico, that the insurance on the Nissan had not lapsed or been cancelled and that there was no basis for GE to charge Wealthberg for GE's insurance. Defendants simply did not care.

*Reporting of Various Loan Payments Being Past Due When There Was*
*Not a Single Missed Payment*

66. GE reported to credit agencies that various business loans taken by Wealthberg were past due when there was never a single late payment on any of those loans.

67. On January 31, 2020, a few days after Vrabel rejected Wealthberg's offer to pay off the Maserati in full but likely before any criminal or civil charges were filed, Vrabel reported to credit agencies that Wealthberg was past due on two home equity loans and on Wealthebrg's Visa, in addition to reporting that Wealthberg's line of credit was 120 days past collection.

68. The various loans and lines of credit that GE and Vrabel reported were owned by separate and distinct businesses.

69. Wealthberg personally had the Visa credit card, a line of credit, and the home equity line of credit on the 101 Lookout Hill Road property. National Healthcare Workers Association, LLC

had the 2018 Maserati lien. Real Estate Network Center, LLC had the 2016 Nissan Rogue and a 2017 Chevy Silverado.

70. GE reported to credit agencies that Wealthberg had personal lines of credits that were untimely paid when, in reality, no payment was ever late and some were even completely paid off.

71. GE also reported to credit agencies that payments pertaining to a personal Visa card were past due when no payments were ever late.

72. In order to force Wealthberg to enter into a settlement agreement regarding the Maserati dispute, Vrabel threatened Wealthberg via email on May 13, 2020, that all false reporting would be done again if she refuses to sign the settlement agreement.

73. Vrabel also threatened that she would accelerate Wealthberg's personal line of credit and Visa card if Wealthberg did not agree to the release.

74. On May 20, 2020, Defendants made true on Vrabel's threats of what would happen if Wealthberg does not sign a settlement agreement. Defendants falsely recoded Wealthberg's accounts to show that her personal accounts were delinquent and in default. GE knew that this was not the case.

75. GE also recoded the property at 70 Fairview Avenue, West Haven, Connecticut as delinquent and 30 days past due for each month from May 2017 until March 2020. In addition, the property was coded as a charge off on a mortgage that was already fully paid off. As with other accounts, this mortgage account was never delinquent.

76. GE also recoded certain property located at 101 Lookout Hill, Milford, Connecticut as delinquent and 30 days past due for each month from June 2019 until March 2020. This account, too, was never delinquent.

77. As part of the tactic to pressure Wealthberg to sign the settlement agreement, GE closed certain bank accounts belonging to Wealthberg, precluding Wealthberg from making certain payments unrelated to the case at bar. After Wealthberg expressed her concern that GE's conduct is illegal, GE reopened the accounts.

78. GE also performed unauthorized credit pulls on Wealthberg's Transunion credit report without her knowledge or consent after GE closed Wealthberg accounts.

79. Vrabel also threatened Wealthberg with criminal charges, accused Wealthberg of fraud and tax fraud on numerous occasions as part of her threats and attempts to have Wealthberg sign a release.

80. GE, Vrabel, and others associated with GE, falsely coded and commented on Wealthberg's personal accounts with the credit reporting agencies to make it appear as though those accounts were 120 days past due.

81. This occurred after Vrabel declined *full payment* of a lien that GE held, opting instead to attempt to seek punitive damages and demanding a settlement agreement whereby Wealthberg would waive claims for all of Defendants' illegal conduct.

82. After Vrabel's continuous threats and improper actions regarding the Maserati loan, Wealthberg reported Vrabel's actions to someone named Tom Gerrity who Wealthberg believes is Vrabel's manager

83. In response to Wealthberg's complaint, Tom Gerrity responded to Vrabel—copying Wealthberg—to tell Vrabel to move all of the loans taken out by businesses that Wealthberg is involved into Wealthberg's personal credit for reporting purposes.

84. After these loans were moved to Wealthberg's personal credit—without Wealthberg's consent—Wealthberg attempted to pay the loans with her existing accounts but her accounts had been closed and her attempts at payment were rejected.

85. Wealthberg's attorney followed up with GE after Wealthberg was unable to make the payments and Vrabel admitted to Wealthberg's attorney that Vrabel had intentionally closed Wealthberg's accounts to cause Wealthberg to be late on payments.

86. GE and Vrabel also reported multiple business loans as past due on Wealthberg's personal credit report, including the Nissan and Chevy—which were registered to Real Estate Network Center—and the Maserati—which was registered to NHCWA.

*Defendants' Threats*

87. Whenever Wealthberg even attempted to allege that GE was doing something wrong, Vrabel would "code" or threaten to "code" all of Wealthberg's accounts for "collection/legal", despite those accounts not being late, and having a negative impact on Wealthberg's credit score.

88. In late January or early February of 2020, in an attempt to humiliate and strong-arm Wealthberg to settle the Maserati dispute, Vrabel went to Wealthberg's work and slid eight letters under the office door, each clearly and inconspicuously stating that Wealthberg's bank accounts had been closed for fraud.

89. Throughout this time period, Vrabel was emailing Wealthberg threats regarding Wealthberg's credit and the filing of a criminal complaint.

90. Vrabel also began leaving voice messages on voicemail machines/systems that were not exclusively Wealthberg's voicemail—which Vrabel knew—that included Wealthberg's personal information and calling Wealthberg a fraud for others to hear.

91. Wealthberg would also make threatening calls to Wealthberg and her daughter, calling Wealthberg "a piece of shit," calling her "retarded" due to Wealthberg's medical condition following a brain injury, and telling her that "[a]ll American lawyers are idiots and they cannot help you. I am an attorney in South Africa and I have a degree in credit management. I will ruin your life."

92. Then on May 7, 2020, during a call between Vrabel and Wealthberg, Vrabel admitted that she was trying to fix Wealthberg's credit and that Vrabel and someone else at GE had a conversation about helping Wealthberg with her credit.

93. But less than a week later, on May 13, 2020, Vrabel emailed Wealthberg and threatened to re-code all of Wealthberg's accounts as past due if Wealthberg did not sign the Maserati settlement agreement.

94. That same day, Vrabel emailed Wealthberg and threatened to accelerate Wealthberg's Visa and personal line of credit if Wealthberg did not sign a Maserati settlement.

95. Vrabel made true on her promise and did accelerate these loans the same day.

96. Vrabel also called Wealthberg and yelled at her that if Wealthberg did not sign the settlement agreement to pay off the Maserati and release GE from any and all claims, Vrabel would have a warrant issued for Wealthberg's arrest.

97. Later that day, Vrabel accused Wealthberg of providing a false signature on a settlement agreement but Wealthberg never signed any such agreement nor told Vrabel that she would sign an agreement.

98. Vrabel also told Wealthberg that the settlement was "off", that criminal charges would be filed against Wealthberg, and that Wealthberg's credit would again be recoded.

99. On May 20, 2020, after Wealthberg did not give in to Vrabel's threats, Vrabel falsely coded Wealthberg's personal accounts as delinquent and in default.

100.     After GE did this, Wealthberg informed Vrabel that she would contact the Attorney General about the false reporting.

*GE's Attempts to Remedy Its Conduct*

101.     After Weathberg said she would seek help from the Attorney General, Defendants began their attempts to fix some of the consequences of their misconduct.

102.     An internal email from Tom Gerrity, GE's Vice President of Lending, indicated to Vrabel that "[Wealthberg] got the loan in June 2019 so she can't be delinquent in June of 2019."

103.     At some point around March 26, 2020, GE did begin correcting certain reports it previously made to the credit reporting agency. This followed an email from GE's counsel indicating that "[he is] concerned about the credit reporting issue and possible GE liability. Resolution of all with releases (even if for less than full payment) would be a home run."[2]

104.     After Wealthberg expressed that she would report GE's behavior to the Attorney General's office, GE changed its tone and began working on correcting its misrepresentations to the credit reporting agencies.

105.     Immediately following Wealthberg informing Vrabel that she would contact the Attorney General, Vrabel claimed that she had never reported late payments on the Fairview property.

106.     About three hours after Vrabel claimed to have never reported late payments, Vrabel further emailed Wealthberg stating that "They are calling me and we are fixing your credit right now!!!!!"

---

[2] Vrabel handed Wealthberg a printed out email exchange, which included internal emails and emails with GE's counsel. Vrabel did so to show Wealthberg the attorney's fees that she wanted Wealthberg to pay.

107.     In a May 16, 2020 email, Vrabel wrote "This member has always paid her loans on time and despite our response trying to rectify your database issues, you have not corrected the reporting. We herewith demand that you immediately rectify the incorrect data that you are reporting for one of our members, Yolanda Wealthberg by close of business, Friday, May 8, 2020 failing which we will take the appropriate legal action on behalf of our member."

108.     GE never took any legal action on Wealthberg's behalf.

*Emotional and Medical Damages*

109.     During the course of GE and Vrabel's false and inaccurate reporting of Wealthberg's credit, harassing phone calls and emails, and improper behavior in order to convince Wealthberg to sign a release, Wealthberg began suffering from panic attacks, anxiety, fatigue, and loss of sleep.

110.     The panic attacks ultimately resulted in Wealthberg needing to be hospitalized, put on medication, and to attend therapy to treat and prevent further panic attacks. Wealthberg would suffer anxiety and panic attacks nearly anytime she communicated with Elsie Vrabel due to Vrabel's hostile and combative nature, as well as her explicit threats to Wealthberg.

111.     Wealthberg's panic attacks were induced in part by Defendants' threats to pursue criminal charges against Wealthberg for allegedly defaulting upon a debt obligation to GE. In addition Defendants' threatened Wealthberg that they would cause her to be arrested, causing to shake uncontrollably at the thought of being arrested, shackled, and held in the custody of either the United States of America or the State Connecticut.

112.     Wealthberg's panic attacks and anxiety were also induced by the thought that the businesses that she built would be destroyed as a result of her declining credit score and the resultant lack of available credit and funding to operate those businesses.  This would cause

16

thousands of healthcare workers who had previously been certified through NHCWA to have to get re-certified through another entity and it was agonizing for Wealthberg to think that such massive fallout could and would result from the Defendants' wrongful acts.

113.    Wealthberg suffered and continues to suffer from anxiety and loss of sleep as a result of GE and Vrabel's actions.

*Financial Damages*

114.    Due to GE and Vrabel's actions, Wealthberg's credit report has been improperly reduced by over 150 points in the last 12 months.

115.    Due to GE and Vrabel's actions, Wealthberg;s companies Wealthberg Real Estate, LLC and Woman Survival were denied credit to purchase three new vehicles by GM Financial Services on August 17, 2020.

116.    Wealthberg had also been unable to make payments on various loans due to GE and Vrabel shutting Wealthberg out of her accounts and not allowing her to make payments, resulting in additional interest on those loans.

117.    Wealthberg has also now required the assistance of multiple attorneys, at great expense to herself, both to attempt to work with GE in order to fix the improper reporting and to file this lawsuit in order to seek damages from GE and Vrabel's improper and illegal conduct.

118.    Furthermore, due to GE and Vrabel's actions, NHCWA was not approved for an Economic Injury Disaster Loan ("EIDL")"), preventing Wealthberg from obtaining much needed funds for her businesses during the pandemic.  NHCWA was conditionally approved by the Small Business Administration ("SBA") for an EIDL in the amount of $150,000.00 on May 26, 2020.

119.    On May 31, 2020 Wealthberg received correspondence from the SBA indicating that her prior request for an EIDL had been denied due to "unsatisfactory credit history."

120.     The denial of EIDL funds caused NHCWA to fall months behind on rent and other business expenses.

121.     The denial of EIDL funds to NHCWA rendered it unable to provide training and certifications to healthcare workers at the height of an unprecedented global pandemic, causing lost revenue for NHCWA and loss of income for Wealthberg.

122.     Wealthberg's loss of income from NHCWA rendered her unable to commit funds to Woman Survival.

123.     Wealthberg's loss of income from NHCWA affected her ability to maintain funding and liquidity for Wealthberg Real Estate, LLC.  This caused Wealthberg Real Estate to fall months behind on rent and to be threatened with eviction.

124.     All these companies were Wealtheberg's primary sources of income and, through Defendants' systematic destruction of her businesses, Defendants ruined Wealthberg both financially and emotionally.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Violation of the Fair Credit Reporting Act)

125.     Plaintiff repeats and realleges the allegations of "Paragraph 1" through "Paragraph 125" of the Complaint as if fully set forth herein.

126.     GE and Vrabel failed to follow and establish reasonable procedures to assure maximum possible accuracy in the preparation of Wealthberg's consumer report and credit file published and maintained.

127.     Wealthberg suffered actual damages, including but not limited to: embarrassment and humiliation, credit rating, lost opportunities to enter into consumer credit transactions, denial of credit, and aggravation, inconvenience, embarrassment, and frustration.

128.     Plaintiff alerted all three major credit reporting agencies (the "CRAs")—Experian, Equifax, and TransUnion–of the erroneous and false information on her credit report that was supplied by GE and Vrabel.

129.     Upon information and belief, the CRAs alerted GE in regards to Wealthberg's dispute over the information provided in her credit report from GE.

130.     Upon information and belief, GE and Vrabel failed to properly investigate Wealthberg and the CRAs' claims that GE and Vrabel provided false and inaccurate information on Wealthberg's credit report.

131.     In the alternative, even if GE and Vrabel did properly investigate Wealthberg and the CRAs' claims that GE and Vrabel provided false and inaccurate information on Wealthberg's credit report, GE and Vrabel ignored the results of the investigation and maintained the false and inaccurate information on Wealthberg's credit report.

132.     GE never corrected the false and inaccurate information on Wealthberg's credit report.

133.     GE and Vrabel's conduct, actions, and inactions were willful and malicious, rendering them liable for punitive damages under the Fair Credit Reporting Act.

134.     In the alternative, GE and Vrabel's actions were—at a minimum—negligent in providing false and inaccurate information to the CRAs.

### AS AND FOR A SECOND CAUSE OF ACTION
#### (Violation of Connecticut Unfair Trade Practices Act)

135.     Plaintiff repeats and realleges the allegations of "Paragraph 1" through "Paragraph 134" of the Complaint as if fully set forth herein.

136.     Defendants engaged in unfair and deceptive practices through their financing and collections business.

137.     Defendants improperly issued multiple false credit reports regarding Wealthberg in an effort to assist in Defendants' business of collecting on loans.

138.     Defendants further improperly repossessed a vehicle that was not the subject of any—even purported—missed payments in an attempt to elicit additional pressure on Wealthberg.

139.     Defendants were fully aware of all of the facts surrounding the Maserati but instead falsely made police reports and filed a civil lawsuit against Wealthberg in order to attempt to improperly collect payment on a loan.

140.     Defendants acted unethically and unscrupulously by taking adverse action against Wealthberg despite Wealthberg not violating any of the terms of her loans.

141.     Defendants further acted unethically and unscrupulously by falsely claiming that they were not aware of certain facts.

142.     Wealthberg suffered harm from Defendants unethical and unscrupulous acts by being unable to use her properties, including but not limited to the wrongful repossession of the Nissan, the improper closing of her accounts, the inability for her to timely pay her loans, harassment, filing of false police reports and lawsuits, and through her emotional distress, which resulted in her hospitalization.

143.     A copy of this Complaint has been sent to the Attorney General and Commissioner of the Department of Consumer Protection, pursuant to C.G.S. § 42-110(g).

## AS AND FOR A THIRD CAUSE OF ACTION
### (Defamation)

144.     Plaintiff repeats and realleges the allegations of "Paragraph 1" through "Paragraph 143" of the Complaint as if fully set forth herein.

145.     Defendants published false statements regarding Wealthberg's payments of various lines of credit to the major credit bureaus, knowing that the credit bureaus would use this information in calculating Wealthberg's credit score.

146.     Defendants had no right or privilege to publish these false statements and these statements.

147.     Defendants maliciously published all of the false information as to Wealthberg's credit and payment history with malice in an attempt to improperly collect on a debt.

148.     Defendants continued to maliciously publish all of this false information as to Wealthberg's credit in an attempt to coerce her into signing a settlement agreement that would have released Defendants from their illegal conduct.

149.     Defendants did this only to harm Wealthberg and in order to aid Defendants in collecting a debt.

150.     Wealthberg's reputation was harmed through the damage to her credit score and her ability to apply for and use her credit.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Injurious Falsehood)

151.     Plaintiff repeats and realleges the allegations of "Paragraph 1" through "Paragraph 150" of the Complaint as if fully set forth herein.

152.     Defendants intentionally made false statements to the credit reporting bureau to harm Wealthberg's credit and businesses.

153.     Defendants published these statements to the credit bureaus, knowing that the credit bureaus would use them in determining Wealthberg's credit.

154.     Defendants' statements to the credit bureaus were the cause of Wealthberg's credit being damaged.

155.     As a result of the false credit reporting, Wealthberg's credit was harmed, resulting in Wealthberg's inability to use her credit to the maximum extent that would otherwise be possible.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

156.     Plaintiff repeats and realleges the allegations of "Paragraph 1" through "Paragraph 155" of the Complaint as if fully set forth herein.

157.     GE and Vrabel intended to inflict emotional distress on Wealthberg in order to coerce Wealthberg into signing an agreement to GE and Vrabel's benefit that would release them for their violations.

158.     In the alternative, GE and Vrabel knew or should have known that their coercive actions were likely to cause Wealthberg emotional distress.

159.     GE and Vrabel's actions through, *inter alia*, the improper coding of Wealthberg's accounts, wrongful repossession of the Nissan, false reports to the credit agencies, false reports to state and federal authorities, threatening, abusive, and harmful language to Wealthberg during the discussions such as calling Wealthberg "retarded" and "a piece of shit" and Vrabel telling Wealthberg that she would ruin her life was extreme and outrageous.

160.     GE and Vrabel's actions caused Wealthberg's emotional distress in hopes that the emotional distress would result in Wealthberg agreeing to a more advantageous settlement for GE.

161.     Wealthberg's emotional distress is severe in that it has resulted in Wealthberg needing to see medical professionals, having panic attacks, and losing sleep.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Violation of the Connecticut Creditor's Collection Practices Act)

162.     Plaintiff repeats and realleges the allegations of "Paragraph 1" through "Paragraph 161" of the Complaint as if fully set forth herein.

163.    Defendants engaged in abusive and/or harassing practices towards Wealthberg in connection with Defendants attempts to collect an alleged debt.

164.    Defendants violated the Connecticut Creditor's Collection Practices Act ("CCPA") in the following ways:

      a.  Communicating with Wealthberg via telephone prior to 8:00 a.m. and/or after 9:00 p.m., in violation of Regs. Conn. State. Agencies § 36a-647-4(a)(1);

      b.  Communicating directly with Wealthberg when they knew that Wealthberg was represented by counsel for this matter, in violation of Regs. Conn. State. Agencies § 36a-647-4(a)(2);

      c.  Communicating with an unauthorized third party—Wealthberg's daughter—regarding the collection of an alleged debt, in violation of Regs. Conn. State. Agencies § 36a-647-4(b);

      d.  Communicating with Wealthberg by using obscene and profane language in connection with their efforts to collect upon an alleged debt, including, *inter alia*, calling Wealthberg "retarded" and "a piece of shit", in violation of Regs. Conn. State. Agencies § 36a-647-5(2);

      e.  Publicly disseminating and displaying information regarding Wealthberg's debt by sliding information regarding the same, under office doors where Wealthberg worked and providing information on non-private voicemails, in violation of Regs. Conn. State. Agencies § 36a-647-5(3);

      f.  Taking unauthorized non-judicial action that dispossessed Wealthberg of the Nissan through the unauthorized repossession of the Nissan, in violation of Regs. Conn. State. Agencies § 36a-647-5(11);

g.  By Vrabel misrepresenting herself as an attorney, in violation of Regs. Conn. State. Agencies § 36a-647-6(3);

h.  By representing that nonpayment of the alleged debt by Wealthberg would result in Wealthberg's arrest, imprisonment, and/or criminal prosecution by threatening to, and in fact filing, complaints with the MPD and FBI, in violation of Regs. Conn. State. Agencies § 36a-647-6(5); and

i.  By falsely representing that Wealthberg had committed a crime or, alternatively, that Wealthberg had engaged in conduct that was shameful or disgraceful by not remitting the sale proceeds from the Maserati to GE, by threatening to, and actually reporting Wealthberg to the MPD and the FBI, in violation of Regs. Conn. State. Agencies § 36a-647-(8).

165.    All of the Defendants violations of the CCPA were intentional and were not bona fide errors.

166.    As a result of GE and Vrabel's violations of the CCPA, Wealthberg has suffered damages, as more fully described above.

### **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court enter a judgment:

a.  Awarding actual damages to be established at trial;

b.  Awarding Plaintiff the costs of this action together with reasonable attorneys' fees;

c.  Awarding Plaintiff punitive damages in an amount to be determined at trial to punish Defendants for their wanton, reckless, and malicious acts described herein, and to protect society against similar acts;

    d.   Awarding Plaintiff pre- and post-judgment interest in the statutory amount; and

    e.   Granting such other and further relief as this Court deems necessary and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  New York, New York
        September 3, 2020

Respectfully submitted,

_____
Stefan Savic
**SHIPKEVICH PLLC**
165 Broadway, STE 2300
New York, New York 10006
Telephone:    (212) 252-3003
Facsimile:    (888) 568-5815
ssavic@shipkevich.com
*Attorneys for Plaintiff*